**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

***DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.***

**June 18, 2020**

# In the Court of Appeals of Georgia

A20A0556. COUNTRYMAN v. THE STATE.

DILLARD, Presiding Judge.

Angelia Countryman appeals her conviction for computer theft, arguing that (1) the trial court erred by denying her plea in bar because the statute of limitation barred her prosecution; (2) the State did not prove beyond a reasonable doubt that she intended to commit the crime; and (3) her counsel had a conflict of interest. For the reasons set forth *infra*, we affirm.[1]

---

[1] Oral argument was held in this case on February 6, 2020, and is archived on the Court's website. *See* Court of Appeals of Georgia, Oral Argument, Case No. A20A0556 (Feb. 6, 2020), available at https://www.gaappeals.us/oav/A20A0556.php. We circulated this decision among all nondisqualified judges to consider whether this case should be passed upon by all members of the Court, but fewer than the required number of judges voted in favor of a hearing en banc on the question of disapproving *Holloman v. State*, 133 Ga. App. 275 (211 SE2d 312) (1974); *State v. Lester*, 170 Ga. App. 471 (317 SE2d 295) (1984) (physical precedent only); *State v. Robins*, 296 Ga. App. 473 (674 SE2d 615) (2009); *State v. Bragg*, 332 Ga. App. 608 (774 SE2d 182)

Viewed in the light most favorable to the jury's verdict,[2] the record shows that from 2006 until 2013, Countryman worked in the National Guard's education office. And during all relevant times, she was the tuition-assistance manager. The National Guard offers its soldiers $4,500 per year for school and pays that money directly to the school they attend. But to enroll in the next semester and qualify for further tuition assistance, the soldier must maintain a 2.0 grade point average, make a passing grade in each class, and attend their classes. And while employed as tuition-assistance manager, Countryman was in charge of tuition assistance and tasked with implementing a process called recoupment. Under the recoupment policy, the school retains any tuition assistance it has been paid, but a soldier who fails a class or fails to attend a class is required to repay those funds to the National Guard. Indeed, if recoupment is owed, the money is paid directly from the soldier to the National Guard, and the school has no further involvement.

As part of her job, Countryman was authorized to enter student grades into a National Guard computer system called iMarc using a "CAC card" that was unique

(2015) (physical precedent only); *Crowder v.* State, 338 Ga. App. 642 (791 SE2d 423) (2016), for the reasons noted *infra*.

[2] *See, e.g.*, *Morris v. State*, 340 Ga. App. 295, 295 (797 SE2d 207) (2017).

to her. Indeed, military rules and regulations precluded her from allowing anyone else to use this card. And in using iMarc, the National Guard had an "honor system" in place, meaning that it accepted a transcript from students or took their word for the grades they received. So, on occasion, education-office employees entered an arbitrary "placeholder grade" for students who needed a passing grade to start the next semester but had not yet received their grades. Under such circumstances, the student was responsible for updating his or her grades with the education office once they were received. That said, it is unclear from the record whether the National Guard had a written policy that a soldier working in the education office could not input his or her own grades into iMarc. Nevertheless, education-office employees apparently knew that they were not supposed to do so. According to Todd Brinkley (who worked with Countryman in the education office), there was *probably* a written policy against it. But at the very least, through training, Brinkley learned not to input his own grades into iMarc. And another employee, Shannon Byrd, testified it would look suspicious if you worked on your own account, and she never did so because she did not want to get in trouble.[3]

---

[3] Lieutenant Colonel Tiffany Sneed was the education officer in the National Guard's education office from August 2007 until August 2011. When asked if she authorized Countryman to input her own grades, Sneed testified: "No, I did not

On October 12, 2012, the National Guard began using a new computer program called GoArmyEd, and the tuition-assistance history in iMarc was transferred to that system. Unlike iMarc, GoArmyEd revealed the identities of employees who entered grades into iMarc, as well as the time and date those grades were entered. And one of the biggest differences between the two systems is that for GoArmyEd, the schools submitted student grades *directly* into the system, rather than having them manually entered by the National Guard's education-office employees (as required by iMarc).

During her time as tuition-assistance manager for the National Guard's education office, Countryman was also a student receiving tuition assistance and was subject to recoupment. And in 2012, Countryman contacted Sheila Schofield—the central assistant tuition manager at St. Leo University—during the fall term, regarding a class she had taken at the school. Countryman previously requested tuition assistance for a math course at St. Leo, and she was ultimately registered for the class. But after the term, Schofield—who was responsible for maintaining grades between the GoArmyEd and St. Leo systems—attempted to find Countryman's grade

authorize her to input her own grades into iMarc. However, I never told anyone in my office not to work on their own account. Should I have? Maybe. But I did not ever say that. . . . At some point, they're going to work on their own stuff." Sneed also testified that she was unaware of any rule or regulation prohibiting education-office employees from working on their own accounts.

for the math class so she could input it into the GoArmyEd system. In doing so, Schofield discovered that the math class for which the tuition assistance was approved had been cancelled, and Countryman was directed to attend a fine-arts class instead. And due to the National Guard's policy that the tuition assistance requested for the math class could not be used for a different class, Schofield "rejected the [tuition assistance] back to the GoArmyEd portal."

According to Schofield, a student must take certain actions if tuition assistance is approved for a class that is cancelled, including dropping the class. Indeed, there is a "drop/add" period in which a student can drop a class, and the National Guard's rules require a student to request tuition assistance for any class five days prior to the start of each term. So, upon learning that Countryman's math class had been cancelled, Schofield immediately contacted Peggy Quick—the National Guard education counselor—to find out if she could do anything to correct Countryman's records to reflect that she attended and passed the fine-arts class. Specifically, Schofield, on behalf of Countryman, wanted to find out if the National Guard could make an exception to the general rule and allow the requested tuition assistance to be used for the fine-arts class. But Quick informed Schofield that tuition assistance must be requested for a specific class prior to the start of the semester. As a result,

Countryman was required to pay recoupment to the National Guard for the math course. Schofield also attempted to secure a grant for Countryman from the school to pay for the course, but her request was denied.

In 2015, Countryman contacted Schofield again regarding tuition assistance for the fine-arts course. This time, Schofield contacted the school's new associate vice president about the situation, and he agreed to grant a scholarship to Countryman to pay for the course. As a result of the scholarship, Countryman was able to enroll in the next semester to finish her degree in human-resource administration. And to aid Countryman in receiving tuition assistance for the new semester, Schofield conducted an academic evaluation of her GoArmyEd records for her previous courses with St. Leo. In doing so, Schofield first noticed that some of the courses listed in Countryman's GoArmyEd records had invalid course numbers or titles. Schofield researched further and discovered that there were also grade discrepancies between Countryman's GoArmyEd records and her official St. Leo transcript. Then, on January 13, 2015, Schofield submitted a GoArmyEd "help desk ticket," explaining the issue because these discrepancies had to be corrected before Countryman could move forward with her degree. Schofield also provided the National Guard with an unofficial copy of Countryman's transcript.

6

Thomas Bolin—the National Guard's education service officer at the time—received Schofield's help desk ticket, began researching the situation, and noticed the discrepancies between Countryman's St. Leo transcript and the grades listed in the GoArmyEd system. Specifically, in auditing Countryman's records, Bolin discovered that some of Countryman's grades were incorrect in the GoArmyEd system. For example, in some instances, Countryman's transcript indicated that she made an F in a class, while her GoArmyEd records indicated that she made an A; and several classes in the GoArmyEd system did not appear on her transcript at all. Upon further investigation, Bolin learned that Countryman worked in the education office previously and that she entered her own grades into iMarc using her CAC card.[4] And in Bolin's view, Countryman must have had full access to the iMarc system to do this. Ultimately, based on the failing grades found on Countryman's transcript (but not in the GoArmyEd system), Countryman owed recoupment to the National Guard for 10 courses, totaling $5,700. And according to Charles Haycraft, who was responsible for training Countryman when she worked at the National Guard's education office, there

_____

[4] The dates on which Countryman entered her grades ranged from January 29, 2007, to August 30, 2011, and only two of the grades she entered were properly recorded.

7

was no way to reconcile the discrepancies in Countryman's records other than to conclude that she entered incorrect grades to "just plain avoid recoupment."

Thereafter, on July 20, 2017, Countryman was charged, via indictment, with one count of computer theft based on the alleged act of altering her grades in the National Guard's computer network, so as to avoid repaying tuition assistance. On April 26, 2018, Countryman was reindicted for the same offense, and the new indictment contained a tolling provision that stated: "Pursuant to [OCGA §] 17-3-2 (2),[5] the Grand Jurors aforesaid also find that the aforementioned crime was unknown until on or about January 13, 2015." According to the new indictment, Countryman's offense was committed "on, about and between the 28th day of July 2007 and the 1st day of October, 2011."

Prior to trial, Countryman filed a plea in bar and motion to dismiss the indictment, alleging that the four-year statute of limitation that applied to her offense expired before the initial 2017 indictment was filed.[6] Specifically, Countryman

---

[5] *See* OCGA § 17-3-2 (2) ("The period within which a prosecution must be commenced under Code Section 17-3-1 or other applicable statute does not include any period in which . . . [t]he person committing the crime is unknown or the crime is unknown[.]").

[6] *See* OCGA § 17-3-1 (c) ("Except as [to certain statutorily enumerated offenses not at issue here], prosecution for felonies . . . shall be commenced within

disputed the indictment's allegation that the crime was unknown until 2015, contending that actual knowledge of the alleged offense can be imputed to the State on July 11, 2013, at the latest, because the victim, the National Guard, was aware of the offense by that date. But following a hearing on the matter, the trial court rejected Countryman's arguments and denied the plea in bar. In its order, the court noted there was no dispute that the indictment was not filed within four years of the crime. But the court found that the National Guard, and thus the State, did not have actual knowledge of the acts forming the basis of the indictment until January 13, 2015, when Schofield informed the National Guard about the discrepancies between the grades listed in Countryman's transcript and those contained in the GoArmyEd system.

Countryman proceeded to trial, and after the State's case, she moved for a directed verdict; but the trial court denied the motion. Following the close of evidence, Countryman renewed her motion for a directed verdict, arguing that the evidence was insufficient to support a conviction. She also moved to quash the

_____

four years after the commission of the crime, provided that prosecution for felonies committed against victims who are at the time of the commission of the offense under the age of 18 years shall be commenced within seven years after the commission of the crime.").

9

indictment, again arguing that it was barred by the statute of limitation. The trial court denied these motions, and ultimately, Countryman was convicted of the charged offense. Countryman then obtained new counsel and filed a motion for a new trial, raising, *inter alia*, the same arguments that she does on appeal. But following a hearing, the trial court denied the motion. This appeal follows.

1. Countryman first argues that the trial court erred in denying her plea in bar because the National Guard had actual knowledge of her alleged computer theft by 2012 at the latest, and therefore, her prosecution was barred by the applicable four-year statute of limitation. We disagree.

The appellate standard of review for a plea in bar asserting a statute-of-limitation defense is a "de novo review of the issue of laws."[7] And because this ruling involves a mixed question of law and fact, we "accept the trial court's findings on disputed facts and witness credibility unless they are clearly erroneous,[8] but

---

[7] *State v. Campbell*, 295 Ga. App. 856, 856 (673 SE2d 336) (2009) (punctuation omitted); *accord State v. Conzo*, 293 Ga. App. 72, 73 (666 SE2d 404) (2008).

[8] A trial court's factual findings are not clearly erroneous if there is "any evidence to support them." *Jones v. State*, 249 Ga. App. 64, 68 (3) (547 SE2d 725) (2001) (punctuation omitted); *accord Michael v. State*, 226 Ga. App. 288, 288 (1) (486 SE2d 406) (1997).

10

independently apply the law to the facts."[9] With these guiding principles in mind, we turn to Countryman's specific argument that the applicable statute of limitation barred her prosecution.

In criminal cases, the statute of limitation "runs from the time of the criminal act to the time of indictment."[10] And the purpose of a statute of limitation is to

> limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.[11]

---

[9] *Campbell*, 295 Ga. App. at 856 (punctuation omitted); *accord Conzo*, 293 Ga. App. at 73.

[10] *Riley v. State*, 305 Ga. 163, 167 (3) (824 SE2d 249) (2019) (punctuation omitted); *accord Jackson v. State*, 306 Ga. 266, 269 (2) (830 SE2d 99) (2019); *Hall v. Hopper*, 234 Ga. 625, 626 (1) (216 SE2d 839) (1975).

[11] *Riley*, 305 Ga. at 167 (3) (punctuation omitted); *accord Womack v. State*, 260 Ga. 21, 22 (4) (389 SE2d 240) (1990); *see also Jenkins v. State*, 278 Ga. 598, 604 (1) (B) (604 SE2d 789) (2004) (noting that statutes of limitation exist "for the protection of the defendant").

Thus, criminal limitation statutes are to be forgivingly interpreted "in favor of repose."[12] That said, statutory provisions providing for the tolling of a statute of limitation are "designed to expand the exposure to criminal prosecution beyond the specified fixed period."[13] Suffice it to say, the burden is unquestionably on the State to "prove that a crime occurred within the statute of limitation, or, if an exception to the statute is alleged, to prove that the case properly falls within the exception."[14] Notably, whether the State has met this burden is "for the finder of fact."[15]

---

[12] *Riley*, 305 Ga. at 167 (3) (punctuation omitted); *accord Toussie v. United States*, 397 U.S. 112, 114 (90 SCt 858, 25 LEd2d 156) (1970); *United States v. Scharton*, 285 U.S. 518, 522 (52 SCt 416, 76 LEd 917) (1932); *Jannuzzo v. State*, 322 Ga. App. 760, 761 (746 SE2d 238) (2013).

[13] *Riley*, 305 Ga. at 167 (3).

[14] *Riley*, 305 Ga. at 167 (3); *accord Harper v. State*, 292 Ga. 557, 563 (738 SE2d 584) (2013); *see also Jackson*, 306 Ga. at 269 (2) ("[When] an exception is relied upon to prevent the bar of the statute of limitation, it must be alleged and proved." (punctuation and citation omitted)); *Moss v. State*, 220 Ga. App. 150, 151 (469 SE2d 325) (1996) (same).

[15] *Crowder*, 338 Ga. App. at 644 (punctuation omitted); *accord Merritt v. State*, 254 Ga. App. 788, 789 (564 SE2d 3) (2002). *Cf. Lee v. State*, 289 Ga. 95, 97 (709 SE2d 762) (2011) (reviewing whether the evidence supported a jury finding that the crimes occurred within the applicable statute of limitation); *State v. Mullins*, 321 Ga. App. 671, 671 (742 SE2d 490) (2013) (affirming trial court's grant of plea in bar where State failed to plead and prove to the court, as factfinder, that the indictment not barred by applicable statute of limitation).

Relevant here, OCGA § 17-3-1 (c) provides that a four-year statute of limitation applies to the offense of computer theft.[16] But under OCGA § 17-3-2 (2), "[t]he period within which a prosecution must be commenced under Code Section 17-3-1 or other applicable statute does not include any period in which . . . [t]he person committing the crime is unknown or the crime is unknown[.]"[17] As a result, the key to determining when the statute of limitation begins to run is "to find when

---

[16] *See* OCGA § 17-3-1 (c) ("Except as [to certain statutorily enumerated offenses not at issue here], prosecution for felonies . . . shall be commenced within four years after the commission of the crime . . . .").

[17] OCGA § 17-3-2 (2); *see also Higgenbottom v. State*, 290 Ga. 198, 204 (3) (719 SE2d 482) (2011) ("Under OCGA § 17-3-2 (2), the applicable statute of limitation is tolled during any period in which the person committing the crime is unknown or the crime is unknown." (punctuation and footnote omitted)); *Womack*, 260 Ga. at 21-22 (2) (noting that one of the statutory exceptions to the four-year statute of limitation period for felonies is when, *inter* alia, the crime is unknown); *Merritt*, 254 Ga. App. at 789 (1) (a) ("The four-year statute of limitation [for a felony offense] does not include any period in which the crime is unknown.").

13

the offender or offense became known."[18] Importantly, the determination of when the crime was discovered is "a factual one."[19]

In this case, it is undisputed that the State did not indict Countryman until July 20, 2017, more than four years after she allegedly committed computer theft—which, according to the indictment, was some time between July 2007 and October 2011. So, her prosecution is barred by the statute of limitation unless the State can prove that the crime was unknown until July 20, 2013, or later.

Here, the State alleged in the indictment, and attempted to prove at trial, that the National Guard (and thus the State)[20] was unaware of Countryman's computer

---

[18] *Merritt*, 254 Ga. App. at 789 (1) (a); *accord McKeehan v. State*, 274 Ga. App. 14, 16 (2) (616 SE2d 489) (2005); *Stack-Thorpe v. State*, 270 Ga. App. 796, 799 (1) (608 SE2d 289) (2004); *see Harper v. State*, 292 Ga. 557, 563 (3) (738 SE2d 584) (2013) ("[T]he correct date to apply in analyzing the statute of limitation [under OCGA § 17-3-2-2] is the date that the crime became known to the victim of the crime.")

[19] *Crowder*, 338 Ga. App. at 644 (punctuation omitted); *accord Campbell*, 295 Ga. App. at 858; *see Merritt*, 254 Ga. App. at 789 (1) (a) ("[T]he key to determining when the statute of limitation begins to run is to find when the offender or offense became known. The State bears the burden of proof in this regard. Whether the State has met this burden is a question for the factfinder." (punctuation and footnote omitted)).

[20] *See Jannuzzo*, 322 Ga. App. at 762 (1) (explaining that for purposes of OCGA § 17-3-2 (2), "the actual knowledge of the victim is imputed to the State"); *Womack*, 260 Ga. at 22 (3) (noting that "the knowledge of the victim is the

14

theft until January 2015. This is when Bolin conducted an audit and discovered that Countryman entered passing grades into iMarc for classes she failed—which, in turn, relieved her from the obligation to pay recoupment. And in denying her plea in bar, the trial court agreed with the State. Our task, then, is simply to determine whether there was any evidence to support this finding of fact.[21]

The Supreme Court of Georgia has held that "the tolling period ends when the State has *actual*, as opposed to constructive, knowledge of both the defendant's identity and the crime."[22] And in *Riley v. State*,[23] our Supreme Court—in addressing

---

knowledge of the State, even though the victim does not represent the State in an official capacity" (punctuation omitted)).

[21] *See supra* notes 8-9 & accompanying text.

[22] *Riley*, 305 Ga. at 168 (3) (emphasis supplied); *see Jannuzzo*, 322 Ga. App. at 761 (explaining that under the exception set forth in OCGA § 17-3-2 (2), "the statute of limitation is tolled until the victim has actual knowledge of the crime—what the victim *actually knew*" (emphasis supplied)); *Kenerly v. State*, 325 Ga. App. 412, 422 (2) (b) (ii) (750 SE2d 822) (2013) ("OCGA § 17-3-2 requires that the state have actual knowledge of a crime; the tolling period is not extinguished when the injured party should have known of the crime."); *Higgenbottom*, 290 Ga. at 204 (3) ("Under OCGA § 17-3-2 (2), the applicable statute of limitation is tolled during any period in which the person committing the crime is unknown or the crime is unknown. The knowledge component of this exception has been construed as requiring the State to have actual knowledge of the identity of the alleged perpetrator of the crime." (punctuation and footnote omitted)).

[23] 305 Ga. 163 (824 SE2d 249) (2019).

15

an issue it described as novel[24]—held that under OCGA § 17-3-2 (2), a person is "known" to the State when the "State possesses sufficient evidence to authorize the lawful arrest of that person for the crime charged."[25] In doing so, the *Riley* Court explained that "[t]he amount of actual knowledge required to lawfully arrest an individual is the familiar 'probable cause' standard."[26] Of course, "probable cause" means: "Facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit a[ ] [criminal] offense."[27] And a "probability" is less than a certainty, but

---

[24] In *Riley*, the Supreme Court of Georgia addressed "the amount and quality of knowledge that the State must possess in order to have actual knowledge of the 'person committing the crime'" under OCGA § 17-3-2 (2). *Riley*, 305 Ga at 168 (3). In doing so, our Supreme Court noted that this "term remain[ed] undefined, and there [was] relatively little case law interpreting OCGA § 17-3-2 (2) [to] guide [it]." *Id.* Indeed, the *Riley* Court found itself "sailing into uncharted waters" in interpreting the statute. *Id.*

[25] *Riley*, 305 Ga at 169 (3).

[26] *Id.*

[27] *Hughes v. State*, 296 Ga. 744, 748 (770 SE2d 636) (2015) (punctuation omitted); *see Bostic v. State*, 332 Ga. App. 604, 606 (774 SE2d 175) (2015) (explaining that probable cause exists for an arrest where "the objective facts known to the officer establish a probability that the suspect has been engaged in illegal activity"); *Devega v. State*, 286 Ga. 448, 451 (4) (b) (689 SE2d 293) (2010)

16

"more than a mere suspicion or possibility."[28] Thus, when a defendant makes a *prima facie* case that the statute of limitation has expired, the State "has the burden of proving that it lacked probable cause to arrest the defendant for a time sufficient to deem the indictment or other charging document timely."[29]

Although *Riley* focused on the amount and quality of knowledge that the State must possess regarding the *person* who committed the crime, rather than knowledge of the crime itself, OCGA § 17-3-2 (2) provides, within the same sentence, that the statute of limitation for a criminal offense is tolled while the person who committed the crime is unknown *or* the crime is unknown.[30] And given this crucial statutory context, we apply the same "probable-cause-to-arrest" standard set forth in *Riley* for

_____

("Probable cause exists if the arresting officer has knowledge and reasonably trustworthy information about facts and circumstances sufficient for a prudent person to believe the accused has committed an offense." (citation and punctuation omitted)).

[28] *Bostic*, 332 Ga. App. at 606 (punctuation omitted); *accord State v. Tye*, 276 Ga. 559, 563 (3) (580 SE2d 528) (2003); *Brown v. State*, 269 Ga. 830, 831 (2) (504 SE2d 443) (1998).

[29] *Riley*, 305 Ga at 169 (3).

[30] *See* OCGA § 17-3-2 (2) ("The period within which a prosecution must be commenced under Code Section 17-3-1 or other applicable statute does not include any period in which . . . [t]he person committing *the crime is unknown or the crime is unknown*[.]" (emphasis supplied)).

17

determining when Countryman's crime was known to the State.[31] As a result, under

the *Riley* Court's interpretation of OCGA § 17-3-2 (2), Countryman's computer theft

was *actually* known to the National Guard, and, therefore, the State, when the State

possessed sufficient probable cause to authorize her lawful arrest for the crime.

Turning to the circumstances of this case, under OCGA § 16-9-93 (a) (1),

[a]ny person who uses a computer or computer network with knowledge that such use is without authority and with the intention of . . . [t]aking or appropriating any property of another, whether or not with the intention of depriving the owner of possession . . . shall be guilty of the crime of computer theft.

---

[31] *See Arizona v. Inter Tribal Council of Arizona, Inc.*, ___ U.S. ___ (133 SCt 2247, 186 LE2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content . . . by their surroundings." (punctuation and citation omitted)); *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) ("[W]e must view the statutory text in the context in which it appears[.]"); *Goldberg v. State*, 282 Ga. 542, 546 (651 SE2d 667) (2007) ("A statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject-matter, briefly called statutes '*in pari materia*,' are construed together, and harmonized wherever possible . . . ." (punctuation omitted)); *see also Scherr v. Marriott Intern., Inc.*, 703 F3d 1069, 1177 (II) (C) (2) (7th Cir. 2013) (Manion, J.) ("In statutory construction cases, we begin with the language of the statute itself and the specific context in which that language is used." (punctuation and citation omitted)).

And OCGA § 16-9-92 (16) defines "use" of a computer as, *inter alia*, "causing or attempting to cause . . . [a] person to put false information into a computer."[32]

Here, the indictment alleged that Countryman committed the foregoing offense in that she

did use a computer network with knowledge that such use was without authority and with the intent to appropriate U.S. Currency, the property of the United States Government, to wit: said accused did use the Georgia Army National Guard computer network to alter her Army education records in such a manner as to avoid reimbursing tuition assistance funds for courses and grades that were not eligible for said funds, contrary to the laws of said State . . . .

For purposes of tolling the statute of limitation, the State contends (and the indictment alleged) that Countryman's crime was unknown to the National Guard until January 2015 when Bolin received and investigated Schofield's help-desk request and discovered that Countryman avoided recoupment by entering false grades into the iMarc system. Countryman disagrees, contending that the statute of limitation began to run on October 1, 2012, at the latest, when the National Guard switched to the GoArmyEd system. And while Countryman did falsify her grades prior to the

---

[32] *See* OCGA 16-9-92 (16) (C).

19

National Guard's switch to the GoArmyEd system, the iMarc system did not reveal who entered each student's grades (even though information was embedded in the system). But the GoArmyEd system, which the National Guard began using on October 1, 2012, revealed which employee entered grades into iMarc, along with the dates and times of those entries. Given the foregoing, Countryman contends that, regardless of whether the National Guard thought it was a crime for Countryman to enter her own grades, it had actual knowledge of its own database on October 1, 2012, which showed that she did so.

As previously noted, the statute of limitation is tolled under OCGA § 17-3-2 (2) until the victim has *actual knowledge* of the crime.[33] Indeed, we have emphasized that OCGA § 17-3-2 requires that the State have "actual knowledge of a crime; the tolling period is *not* extinguished when the injured party *should have known* of the crime."[34] Here, it is undisputed that the National Guard did not *actually know* that Countryman entered her own grades in October 2012 merely because that information

---

[33] *See supra* note 22 & accompanying text.

[34] *Kenerly*, 325 Ga. App. at 422 (2) (b) (ii) (emphasis supplied); *see Royal v. State*, 314 Ga. App. 20, 22-23 (1) (723 SE2d 118) (2012) ("The tolling period is not extinguished when the injured party should have known; rather, it ends when the injured party has actual knowledge of the crime." (punctuation omitted)); *Campbell*, 295 Ga. App. at 858 (same); *supra* note 22.

became available in GoArmyEd; and it is irrelevant whether the National Guard *should* have known all of the contents of its database. Indeed, under OCGA § 17-3-2 (2), "the statute of limitation does not run while [the crime or] the person who committed the crime is 'unknown'—it does not say 'and could not have been discovered through the exercise of reasonable diligence.'"[35]

Moreover, even if the National Guard were actually aware that Countryman entered her own grades—with or without authorization to do so—in October 2012, the undisputed evidence shows that it did not become aware that the grades she entered *were false* until January 2015. This is when Schofield submitted the help-desk request and provided the National Guard with her transcript such that it could, for the first time, compare the transcript with her GoArmyEd records.[36] Indeed, if

---

[35] *Beasley v. State*, 244 Ga. App. 836, 838 (536 SE2d 825) (2000); *accord Kenerly*, 325 Ga. App. at 422 (2) (b) (iii); *see Campbell*, 295 Ga. App. at 858 (holding that the tolling period ended when employer actually learned of crime, not when employer could have discovered crime through the exercise of reasonable diligence); *supra* note 22.

[36] While Countryman testified that she provided her transcript to the National Guard each semester, and that she never entered her own grades into iMarc, it was for the trial court, as the fact finder, to determine whether her testimony in this respect was credible. *See State v. Bair*, 303 Ga. App. 183, 183 (692 SE2d 806) (2010) (explaining that, in reviewing the denial of a plea in bar, "we must accept the trial court's findings on disputed facts and witness credibility unless those findings are clearly erroneous"). And because there was also testimony that no one at the National

21

Countryman had entered her grades accurately, her actions would not have deprived the government of $5,700 in recoupment, and she would not have committed computer theft. Thus, under *Riley*'s probable-cause-to-arrest standard, the statute of limitation did not begin to run until "the objective facts known to the [State] establish[ed] a probability that [she] ha[d] been engaged in *illegal* activity."[37] And the undisputed evidence shows that Bolin, and therefore the National Guard, did not actually know Countryman's grade entries were *criminal* until his 2015 audit.

Given the foregoing, the trial court's factual finding that the National Guard did not have actual knowledge of Countryman falsely entering her grades until 2015 was supported by at least some evidence.[38] And under *Riley*, the statute of limitation

---

Guard knew that Countryman entered false passing grades until Bolin investigated Schofield's help-desk request, the trial court's credibility finding in this regard is not clearly erroneous. *See Jones*, 249 Ga. App. at 68 (3) ("[A] trial court's findings of fact are not clearly erroneous if there is any evidence to support them." (punctuation omitted)).

[37] *Bostic*, 332 Ga. App. at 606 (emphasis supplied); *Hughes*, 296 Ga. at 748 ("As the United States Supreme Court has explained, 'probable cause' means: Facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect *has committed, is committing, or is about to commit a[ ] [criminal] offense.*" (punctuation omitted) (emphasis supplied)).

[38] *See Beauchamp v. State*, 258 Ga. App. 871, 871 (575 SE2d 731) (2002) ("The trial court in this case sat as the factfinder, and we will not disturb its findings

22

was tolled until that time because the State did not have probable cause to arrest Countryman for computer theft until the National Guard knew that she appropriated government tuition-assistance funds by entering false grades. Simply put, because the National Guard lacked knowledge of Countryman's crime until 2015, the statute of limitation was tolled until that time under OCGA § 17-3-2 (2), and the 2017 indictment was timely.[39]

---

unless they were clearly erroneous. And a trial court's findings of fact are not clearly erroneous if there is *any evidence to support them*." (punctuation omitted) (emphasis supplied)); *see also Campbell*, 295 Ga. App. at 858 ("[T]he determination of when the crime was discovered is a factual one[.]").

[39] *See Royal*, 314 Ga. App. at 22-23 (1) (holding that while an employee of an insurance company who called the "fraud hotline" may have had knowledge of the crime, the statute of limitation was tolled until the victim insurance company had "actual firsthand knowledge" of the crime); *Campbell*, 295 Ga. App. at 857-58 (holding that the trial court erred in granting the defendant's plea in bar based on a statute-of-limitation argument when, although he submitted fraudulent expense reports at earlier dates, his employer did not actually know that the defendant did so until an audit was performed within the limitation period); *Beasley*, 244 Ga. App. at 837-38 (holding that the statute of limitation for burglary began to run when fingerprint evidence was analyzed and matched, not when law-enforcement lifted the fingerprint from the crime scene); *see also Royal*, 314 Ga. App. at 22-23 (1) ("The tolling period is not extinguished when the injured party should have known; rather, it ends when the injured party has actual knowledge of the crime." (punctuation omitted)); *Beasley*, 244 Ga. App. at 838 (explaining that under OCGA § 17-3-2 (2), "the statute of limitation does not run while [the crime or] the person who committed the crime is 'unknown'—it does not say 'and could not have been discovered through the exercise of reasonable diligence'"). Countryman also presents arguments regarding why the National Guard knew that she entered her grades without authority

In its brief, the State argues that we should disapprove of certain cases, some of which are relied upon by Countryman and all of which were decided before *Riley*. These pre-*Riley* decisions suggest or expressly hold that a victim has actual knowledge of a crime when he or she becomes aware of the *act* effectuating the crime, regardless of whether he or she had knowledge that the act was illegal. These cases stem from our 1974 decision in *Holloman v. State*.[40] According to *State v. Robins*,[41] *Holloman* held that "lack of knowledge of the illegality of the act was not sufficient to toll the limitation period, but rather there must be lack of knowledge of the act itself."[42] And *State v. Bragg*,[43] which is physical precedent only, cites *Robins* for the same proposition.[44] Lastly, relying on *Bragg*, *State v. Crowder*[45] held that "[t]o

_____

and with intent to commit the crime prior to 2012. But because the trial court's factual finding that the National Guard did not have actual knowledge of Countryman falsely entering her grades until 2015 was supported by at least some evidence, we need not separately address these arguments.

[40] 133 Ga. App. 275 (211 SE2d 312) (1974).

[41] 296 Ga. App. 437 (674 SE2d 615) (2009).

[42] *Id.* at 439 (1).

[43] 332 Ga. App. 608 (774 SE2d 182) (2015) (physical precedent only).

[44] *See id.* at 611 (2).

[45] 338 Ga. App. 642 (791 SE2d 423) (2016).

avail itself of the tolling provision, the [victim] must have lacked knowledge of the act itself."[46]

Applying these cases to the instant case,[47] it is not unreasonable to conclude that the National Guard knew of the act effectuating the crime for purposes of OCGA § 17-3-2 (2) when it became aware that Countryman entered her own grades, even if it did not know that, in doing so, she committed computer theft. But these cases would not change the outcome in *this* case because the National Guard learned that Countryman entered her own grades (*i.e.*, the act itself) and that her actions were illegal simultaneously in 2015 when Bolin researched that issue. Nevertheless, even if the National Guard actually knew that Countryman entered her own grades in 2012, but did not know that her actions were illegal, we are bound by our Supreme Court's decision in *Riley*, which holds that a crime is known when "the State possesses sufficient evidence to authorize the lawful *arrest* of that person for the *crime* charged."[48] And probable cause to arrest exists where, "based on objective facts and circumstances, a man of reasonable caution would believe that *a crime* has been or

---

[46] *Id*. at 646.

[47] *See also Lester*, 170 Ga. App. at 472 (physical precedent only).

[48] *Riley*, 305 Ga at 169 (3) (emphasis supplied).

is being committed."[49] Moreover, the existence of probable cause must be measured by "current knowledge, i.e., at the moment the arrest is made and not in hindsight."[50] Thus, under *Riley*, a victim does not have knowledge of a crime for purposes of tolling the statute of limitation until it has *actual* knowledge that the act at issue is, in fact, criminal and a lawful arrest can be made. As a result, we disapprove of

---

[49] *Minor v. State*, 298 Ga. App. 391, 396 (1) (b) (680 SE2d 459) (2009) (punctuation omitted); *accord Grandberry v. State*, 289 Ga. App. 534, 539 (2) (658 SE2d 161) (2008).

[50] *Minor*, 298 Ga. App. at 396 (1) (b) (punctuation omitted).

*Holloman* and its progeny,[51] then, only to the extent that these decisions conflict with the probable-cause-to-arrest standard established by our Supreme Court in *Riley.*[52]

2. Next, Countryman contends the State failed to prove that she intended to appropriate funds when she entered her grades incorrectly, but, in essence, she argues the State failed to prove that she appropriated funds at all. Again, we disagree.

When a criminal conviction is appealed, the evidence must "be *viewed* in the light most favorable to the verdict, and the appellant no longer enjoys a presumption

---

[51] *See Holloman*, 133 Ga. App. at 277-78 (4); *Robins*, 296 Ga. App. at 439 (1); *Crowder*, 338 Ga. App. at 646; *see also Bragg*, 332 Ga. App. at 611 (2) (physical precedent only); *Lester*, 170 Ga. App. at 472 (physical precedent only). Although *Bragg* and *Lester* are physical precedents, we include these opinions as part of the line of jurisprudence being disapproved to ensure that they are not cited in future cases as persuasive authorities for the proposition being disapproved of in this case. *See* Court of Appeal Rule 33.2 (a) (2) ("Prior to August 1, 2020: If an appeal was decided by a division of this Court, a published opinion in which all three panel judges fully concur is binding precedent. An opinion is physical precedent only (citable as persuasive, but not binding, authority), however, with respect to any portion of the published opinion in which any of the panel judges concur in the judgment only, concur specially without a statement of agreement with all that is said in the majority opinion, or dissent.").

[52] *See State v. Brown*, 201 Ga. App. 771, 772-73 (2) (412 SE2d 583) (1991) ("The decisions of the Court of Appeals insofar as not in conflict with those of the Supreme Court shall bind all courts *except the Supreme Court as precedents*." (emphasis supplied)); *Taylor v. Georgia Power Co.*, 137 Ga. App. 44, 45-46 (1) (222 SE2d 869) (1975) ("[A]n intermediate appellate court is bound by the decisions of the Supreme Court[.]").

of innocence."[53] And in evaluating the sufficiency of the evidence to support a conviction, we do not weigh the evidence or determine witness credibility but only resolve whether "a rational trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt."[54] Accordingly, the jury's verdict will be upheld so long as "there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case."[55] With these guiding principles in mind, we turn to Countryman's specific challenge to the sufficiency of the evidence to support her conviction.

As previously noted, under OCGA § 16-9-93 (a) (1),

> [a]ny person who uses a computer or computer network with knowledge that such use is without authority and with the intention of . . . taking *or appropriating* any property of another, whether or not with the intention

---

[53] *Howard v. State*, 340 Ga. App. 133, 136 (1) (796 SE2d 757) (2017); *see Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[54] *Howard*, 340 Ga. App. at 136 (1) (punctuation omitted); *accord Joiner v. State*, 299 Ga. App. 300, 300 (682 SE2d 381) (2009); *see Jackson*, 443 U.S. at 319 (III) (B).

[55] *Howard*, 340 Ga. App. at 136 (1) (punctuation omitted); *accord Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001).

of depriving the owner of possession . . . shall be guilty of the crime of computer theft.[56]

Here, Countryman argues that even though Georgia's theft-by-taking statute encompasses all forms of theft, there is no Georgia case in which the defendant has been convicted of theft without intending to—at some point—possess the stolen item or provide it to a third party who is part of a conspiracy. But Countryman was not indicted for theft by taking. And in fact, the word "theft" does not even appear in the indictment.[57] Instead, Countryman was charged with the intent to *appropriate* funds of the United States Government by altering her education records in such a manner as to avoid reimbursing tuition.

---

[56] (Emphasis supplied).

[57] As previously noted, the indictment alleged that Countryman committed the foregoing offense in that she

> did use a computer network with knowledge that such use was without authority and with the intent *to appropriate* U.S. Currency, the property of the United States Government, to wit: said accused did use the Georgia Army National Guard computer network to alter her Army education records in such a manner as to avoid reimbursing tuition assistance funds for courses and grades that were not eligible for said funds, contrary to the laws of said State . . . . (Emphasis supplied).

29

Countryman further maintains that, typically, to appropriate something is to "take exclusive possession," to "set apart or assign to a particular purpose or use," or "to take or make use of without authority or right." But even if she is correct in her understanding of the meaning of "appropriate,"[58] this is exactly what she did. The National Guard paid its own funds to St. Leo as tuition assistance *on Countryman's behalf.* It is undisputed that, for courses she failed or failed to attend, Countryman was required to reimburse those funds to the National Guard through its recoupment policy. And even though the funds at issue were initially paid to St. Leo, a third party, the school retained the funds and there was testimony that, once recoupment is owed, there is no further involvement by the school in the process. Indeed, as to recoupment, which Countryman indisputably owed, the process was solely between "the military and the soldier." Simply put, by entering passing grades for classes she failed, Countryman appropriated $5,700 of National Guard funds to herself without authority

---

[58] *See* The Compact Oxford English Dictionary 66 (2nd. Ed. 1991) (defining appropriate as, *inter alia*, "[t]o take possession of for one's own, to take to one's self"); Black's Law Dictionary 98 (7th ed. 1999) (defining "appropriation" as , *inter alia*, "The exercise of *control* over property; a taking of possession." (emphasis supplied); Merriam-Webster's Dictionary https://www.merriam-webster.com/dictionary/appropriate?src=search-dict-box (last viewed on March 26, 2020) (defining appropriate as (1) to take exclusive possession of; (2) to set apart or assign to a particular purpose or use; or (3) to take or make use of without authority or right).

or right for her exclusive use by eliminating the debt she owed to the National Guard.[59]

3. Finally, Countryman contends that her trial counsel suffered from a conflict of interest when he declined to have opening and closing arguments transcribed. Once again, we disagree.

As recently explained by the Supreme Court of Georgia, included within the constitutional right to counsel is "the right to representation that is free from conflicts

---

[59] *See Disciplinary Counsel v. Parnoff*, 324 Conn. 505, 516 (152 A3d 1222) (2016) ("[T]he term 'appropriate' is defined as 'to take possession of or make use of exclusively for oneself, often without permission." (quoting the American Heritage College Dictionary)); *see supra* note 58. Countryman also alleges that her conviction violates the Georgia Constitution, which provides that "[t]here shall be no imprisonment for debt." Ga. Const. Art. I § I, Para. XXIII. But Countryman did not raise and the trial court did not address this constitutional argument below. Indeed, in her motion for a new trial, Countryman challenged her conviction only "under the general grounds[,]" and the trial court rejected her argument that there was insufficient evidence to support her conviction. Thus, because Countryman's constitutional challenge is raised for the first time on appeal, we need not transfer this case to the Supreme Court of Georgia for resolution. *See Smart v. State*, 318 Ga. App. 882, 884 (2) (732 SE2d 850) (2012) ("Our Supreme Court has exclusive appellate jurisdiction over cases in which the constitutionality of a law, ordinance, or constitutional provision has been drawn into question, but will not rule on a constitutional question unless it clearly appears in the record that the court distinctly ruled on the point." (punctuation omitted)).

of interest."[60] And in order for an appellant to prevail on a claim that his attorney was operating under a conflict of interest that violated his right to counsel, he must "show an *actual* conflict of interest that adversely affected his attorney's performance."[61]

Here, Countryman maintains that her trial counsel declined to request transcripts of opening and closing arguments due to a conflict of interest because he received a significant amount of business from the public defender's office and was unsure whether that office would disapprove of such a request due to the cost. And at the motion-for-new-trial hearing, trial counsel admitted that it is "best practice to ask for opening and closing to be taken down. . . ." But counsel also testified that he was not statutorily required to have opening and closing arguments transcribed, and he could not find a reason to "stray from the default statutory position." Indeed, our Supreme Court has made clear that "[t]he arguments of counsel at trial are not required to be transcribed."[62]

---

[60] *Johnson v. State*, 305 Ga. 475, 477 (2) (a) (826 SE2d 89) (2019) (punctuation omitted).

[61] *Id.* (punctuation omitted) (emphasis supplied).

[62] *Norton v. State*, 293 Ga. 332, 339 (7) (d) (745 SE2d 630) (2013) (punctuation omitted); *see* OCGA § 17-8-5 (a) ("On the trial of all felonies the presiding judge shall have the testimony taken down and, when directed by the judge, the court reporter shall exactly and truly record or take stenographic notes of the testimony and

When expressly asked whether he had the impression that the public defender's office preferred him not to have the arguments transcribed, counsel testified that he "had gotten very unclear feedback on the subject." Nevertheless, counsel testified that the cost of the transcripts was not a consideration in his decision not to request them. According to Countryman's trial counsel, he did not request the transcripts because if anything objectionable happened, which he did not expect it would, he could have objected and preserved the objection. And in the context of ineffective-assistance-of-counsel claims, we have held, under similar circumstances, that a defendant was not prejudiced by his counsel's failure to have opening and closing arguments transcribed,[63] which is essentially the same as saying that counsel's actions did not "adversely affect[ ] [his] performance."[64] Moreover, because counsel testified that he

proceedings in the case, *except the argument of counsel*." (emphasis supplied)).

[63] *See Norton*, 293 Ga. at 339 (7) (d) (holding that counsel was not ineffective for failing to request transcripts of the attorneys' arguments based on cost considerations when counsel testified that "had objectionable questions been asked or argument been made, he would have objected and caused the court to make a record of them to preserve them for appellate review[]"); *Dunlap v. State*, 291 Ga. 51, 53 (3) (727 SE2d 468) (2012) ("Counsel's practice [of not requesting that opening and closing statements be transcribed] was within the broad range of professional conduct afforded to trial counsel in a non-death penalty case such as the one at bar.").

[64] *Johnson*, 305 Ga. at 477 (2) (a) (punctuation omitted) (emphasis supplied); *see Turner v. State*, 273 Ga. 340, 342 (2) (a) (541 SE2d 641) (2001) ("In order for

33

would have preserved any objection to improper argument by the State, any claim that

Countryman was prejudiced by counsel's failure to request that those arguments be

transcribed is purely speculative.[65] Thus, Countryman has not established that her

counsel had an *actual* conflict of interest that adversely affected his performance.[66]

For all these reasons, we affirm Countryman's conviction.

*Judgment affirmed. Rickman and Brown, JJ., concur.*

---

appellant to prevail on his claim that his attorney was operating under a conflict of interest that violated his right to counsel, he must show an actual conflict of interest that adversely affected his attorney's performance.").

[65] *See Norton*, 293 Ga. at 339 (7) (d) (holding that any claim that the defendant was prejudiced by counsel's failure to request transcriptions of opening and closing argument was purely speculative); *Dunlap*, 291 Ga. at 53 (3) ("Appellant's speculation that error may have occurred [during opening and closing arguments] is insufficient to show any deficiency on the part of counsel, or prejudice therefore, and is insufficient to show reversible error").

[66] *See Wright v. State*, 274 Ga. 730, 732 (559 SE2d 437) (2002) (holding that the defendant was not prejudiced by counsel's failure to request transcripts of voir dire or opening and closing arguments when counsel testified "that nothing objectionable occurred during voir dire and opening and closing arguments, and had there been, he would have requested a record of the events"); *Williams v. State*, 265 Ga. 681, 682 (3) (461 SE2d 530) (1995) ("We will not reverse [the defendant's] conviction simply because the voir dire, the opening statements, and the closing arguments were not transcribed. [the defendant] must demonstrate harm or prejudice stemming from the absence of a transcript." (citations omitted)); *see also Clayton v. State*, 319 Ga. App. 713, 714 (1) (738 SE2d 299) (2013) ("An appellant must show harm as well as error to prevail on appeal.").